[Civ. No. 10413. Third Dist. Feb. 5, 1963.]

THE PEOPLE, Plaintiff and Appellant, v. NEW PENN MINES, INC., Defendant and Respondent.

Stanley Mosk, Attorney General, and J. M. Sanderson, Deputy Attorney General, for Plaintiff and Appellant.

Lally, Martin & Luce, Thomas W. Martin and John Amos Fleming for Defendant and Respondent.

FRIEDMAN, J.—Defendant corporation is owner of the Penn Mine, which lies adjacent to the Mokelumne River in Calaveras County, a few miles below Pardee Dam. The Attorney General sues it in the name of the People, seeking abatement of a public nuisance caused by drainage of toxic mine wastes into the river and resulting damage to fish life. Defendant demurred generally and on the ground of lack of subject-matter jurisdiction. The lower court sustained the demurrer with leave to amend. The Attorney General declined to amend and judgment was entered from which he appeals.

Since we are reviewing a ruling on demurrer we assume the truth of the complaint. The complaint and an accompanying exhibit allege substantially as follows: In a state of nature the Mokelumne River is the seasonal spawning ground of king salmon and steelhead trout. It also supports a population of nonmigratory game fish. The Penn Mine was once extensively mined for copper and zinc, although for some years it has been relatively inactive. During the years of active extraction operations fluid mine wastes were drained into settling ponds and ore tailings were piled in dump areas. The settling ponds now contain accumulations of finely grained wastes. Both the ore tailings and the accumulated pond wastes are rich in soluble mineral salts. During the rainy season surface water flows over the dumps and pond wastes, picking up concentrations of minerals which drain into the Mokelumne River. These mineral pollutants are extremely harmful to fish life and have resulted in kills of salmon and steelhead.

Basic to the lower court's ruling was the proposition that the problem is one entrusted to the administration of the appropriate regional water pollution control board, acting under the provisions of the Dickey Water Pollution Act (Wat. Code, §§ 13000-13064) : that the injunction action must fail because administrative remedies before the water pollution control board had not been attempted, much less exhausted. In response, the Attorney General contends that he has broad common law powers to protect the public against nuisances; that, in the absence of *express* statutory restriction, his common law powers enable him to invoke the traditional equity powers of the court to abate this public nuisance.

Expressed in one way, the problem appears in a jurisdictional guise, that is, whether the superior court has jurisdiction to entertain a nuisance abatement action when statu-

tory procedures before an administrative agency have not been invoked or exhausted. (See *California Oregon Power Co.* v. *Superior Court,* 45 Cal.2d 858, 869-870 [291 P.2d 455].) Expressed in another way, the problem is one of measuring the scope of official authority, that is, whether the statutory powers reposed in the pollution control board trench upon the Attorney General's authority to maintain this particular kind of abatement action. (See *People* v. *City of Los Angeles,* 160 Cal.App.2d 494, 503 [325 P.2d 639].) Both questions may be combined in a single inquiry: Has the Legislature delegated exclusive state agency jurisdiction to the water pollution control boards, or does it permit concurrent exercise of the common law powers of the Attorney General?

█ As chief law officer of the state the Attorney General has broad common law powers. In the absence of legislative restriction he has the power to file any civil action which he deems necessary for the enforcement of the laws of the state and the protection of public rights and interests. (*Pierce* v. *Superior Court,* 1 Cal.2d 759, 761-762 [37 P.2d 453, 460, 96 A.L.R. 1020] ; *State* v. *Finch,* 128 Kan. 665 [280 P. 910, 66 A.L.R. 1369] ; cf. Govt. Code sec. 12512.) He may file such an action in the name of the people of the state. (*People* v. *Oakland Water Front Co.,* 118 Cal. 234, 240 [50 P. 305].) A public nuisance may be abated by any authorized officer or agency. (Civ. Code § 3494.) On various occasions in the past California courts have distinctly sanctioned the Attorney General's maintenance of nuisance abatement actions aimed at stream pollution harmful to fish life. (*People* v. *Truckee Lumber Co.,* 116 Cal. 397 [48 P. 374, 58 Am.St.Rep. 183, 39 L.R.A. 581] ; *People* v. *Glenn-Colusa Irr. Dist.,* 127 Cal.App. 30 [15 P.2d 549].)

In 1949 the Legislature adopted the broad statutory program called the Dickey Water Pollution Act. The act establishes a state water pollution control board and a series of regional boards. (Wat. Code, § 13010-13011, 13040-13041.) It sets out three specially defined concepts of water quality impairment, designated respectively as contamination, pollution, and nuisance. (Wat. Code, § 13005.) █ In a general way, the statutory concept of contamination denotes an actual health hazard, while pollution and nuisance refer to the economic and aesthetic spoilage of water. Any person proposing to discharge sewage or industrial waste must apply to the regional board for a set of requirements governing the

discharge. (§ 13054.) ▆ On its own motion, a regional board may prescribe requirements relative to any particular condition of pollution or nuisance, existing or threatened. (§ 13053.) ▆ Discharges causing "contamination" must be referred to the state pollution board and to the health authorities. (§§ 13025, 13052, subd. (g).) Once discharge requirements are established, violators who cause "pollution" or "nuisance" are pursued by means of cease and desist orders issued by the regional board. (§ 13060.)

Section 13063 describes how the violator of a cease and desist order may be brought before the courts: "Upon failure of any person or persons to comply with any such cease and desist order of the board, the board issuing the order shall certify the facts to the district attorney for the county in which the discharge originates, whereupon such district attorney shall petition the superior court in and for that county for the issuance of an injunction restraining such person or persons from continuing the discharge in violation of the requirements. The court shall thereupon issue an order directing the person to appear before the court and show cause why the injunction should not be issued. Thereafter the court shall have jurisdiction of the matter, and proceedings thereon shall be conducted in the same manner as in any other action brought for an injunction. The court shall receive in evidence the order of the board, evidence as to the validity and reasonableness of the board's requirements as previously established, and such further evidence as the court in its discretion deems proper.

"When complaint is made to the Attorney General that the district attorney of any county has not performed a duty devolving upon him by the provisions of this division or is not proceeding with due diligence or in the proper manner in the performance of the duty, the Attorney General shall make an investigation. If he finds the charge to be true, the Attorney General shall diligently prosecute the action to secure the issuance of an injunction restraining the person or persons who have failed to comply with any such order of the board from continuing the discharge in violation of the requirements, and in such case he shall have the powers and duties of the district attorney."

The Dickey Act declares the necessity of coordinating the actions of various state agencies in achieving "regional" control of water pollution. (§ 13000.) In section 13001, subdivision (b), the act states that none of its provisions

limits the power of cities and counties to abate nuisances. Section 13001, subdivision (c), provides that none of these provisions limits the power of a state agency in the enforcement of any law which it is specifically permitted or required to enforce.

Concurrently with the Dickey Act, the 1949 Legislature added a section to the Fish and Game Code. Now numbered 5651, it reads as follows: "Whenever it is determined by the department [of Fish and Game] that a continuing and chronic condition of pollution exists, the department shall report such condition to the appropriate regional water pollution control board, and shall cooperate with and act through such board in obtaining correction in accordance with any laws administered by such board for control of practices for sewage and industrial waste disposal."

In 1959, for the first time, provisions were added to the Dickey Act authorizing limited summary remedies for the control of pollution and nuisance. Section 13054.4 authorized a district attorney upon request of the regional board to file an injunction action against a discharger who had failed to apply to the board for waste discharge requirements. Section 13080 was also added permitting a district attorney either with or without a request from the regional board to file a civil action to abate pollution or nuisance "which is transitory in nature or is of short duration but periodic in occurrence."

 The Dickey Act defines industrial waste as "liquid or solid waste substance, not sewage, from any producing, manufacturing or processing operation of whatever nature." (Wat. Code, § 13005.) Mine wastes, such as ore tailings and refinery runoff, fall within this definition. In one sense the owner or person responsible for an inactive or abandoned mine is not actively "discharging" industrial waste. Yet, when surface water or some other mechanism causes drainage of accumulated mine wastes into a stream or other water body, a condition of pollution or nuisance, actual or threatened, may occur. The drainage then falls within the administrative sphere and within the enforcement powers of the regional and state water pollution control boards. (Wat. Code, § 13053; 26 Ops.Cal.Atty.Gen.88; 27 Ops.Cal.Atty.Gen.182.) In this case the regional water pollution control board having jurisdiction over the Mokelumne River watershed has statutory administrative and enforcement power over the identical drainage situation involved in

the present action. These statutory powers are either concurrent with the enforcement method adopted by the Attorney General in this action or exclude it.

In *People* v. *City of Los Angeles,* 160 Cal.App.2d 494 [325 P.2d 639], two municipalities sought judicial abatement of a nuisance created by discharge of sewage into Santa Monica Bay. As in this case, the defendant argued that the Dickey Act reposed exclusive jurisdiction in the water pollution control agencies and thus there had been no exhaustion of administrative remedies. As here, the court had to decide whether the traditional nuisance action was now excluded by statute or preserved as a concurrent remedy. Embracing the latter alternative, the court said: "There is nothing in the [Dickey] act which expressly or impliedly places in the state board or any regional board the exclusive power to declare that a nuisance exists or to take action to abate a nuisance. To the contrary the power of any city or county to declare, prohibit or abate nuisances is expressly reserved to them by Water Code, section 13001. This section reads in part as follows: 'No provision of this division or any ruling of the State Water Pollution Control Board or a regional water pollution control board is a limitation: . . . (b) on the *power of any city* or county to *declare, prohibit,* and *abate nuisances.*' This express reservation of the rights of the plaintiff cities to prosecute the subject action clearly negatives any intent to give the control boards the exclusive right to determine either what does or does not constitute a nuisance or to invoke the equity powers of the courts of this state to abate a public nuisance." (Pp. 502-503.)

In this action, the Attorney General invokes section 13001, subdivision (c) as a similar preservative of concurrent action. That provision declares that neither the Dickey Act nor any ruling of the water pollution control boards is a limitation "On the power of a state agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer." The statute is a saving clause, designed to preserve the enforcement powers of those state agencies *specifically* endowed with such powers. The Legislature employed the word "specifically" in its dictionary sense, that is, as a description of a precisely formulated or explicit grant of power. (See *People* v. *Thomas,* 25 Cal.2d 880, 898 [156 P.2d 7].) It is difficult to conceive of an explicit grant of power which does not have its source in an express enact-

ment, constitutional or statutory. ██ The power here asserted, in contrast, is part of a generalized accumulation of historic and traditional powers recognized by the usage and custom of English and American courts and which are generally called "common law powers." Such powers are not explicitly granted nor are their limitations explicitly defined. (See *People* v. *Lim*, 18 Cal.2d 872 [118 P.2d 472].) Such a set of powers is not "specifically" delegated to the Attorney General and, so far as impaired by the Dickey Act, is not protected by section 13001, subdivision (c).

The Attorney General contends that his power to abate a public nuisance, as defined in the Civil Code, is a "specific" grant protected by section 13001, subdivision (c). Civil Code sections 3479 and 3480 define "public nuisance" but do not delegate enforcement powers. Section 3494 of that code provides that "A public nuisance may be abated by any public body or officer authorized thereto by law." Section 731, Code of Civil Procedure, specifically says that an abatement action, in the name of the people, may be brought by a district attorney or city attorney. None of these general provisions mentions the Attorney General. ██ Without minimizing the undoubtedly broad and substantial powers of the Attorney General in public nuisance abatement, we hold that the absence of express statutory reference to those powers leaves him outside the protective scope of Water Code section 13001, subdivision (c).

The Dickey Act, viewed as a complete statutory plan, requires us to adopt the alternative of exclusion. ██ In our view, the Legislature intended the Dickey Act to provide the exclusive means and procedure by which agencies of the state government, including the Attorney General, are to control water pollution and nuisance. The Legislature did not establish a hierarchy of administrative agencies, a carefully conceived group of artificial definitions, a deliberately designed distribution of powers and a set of administrative procedures with the notion that any branch of the state government—armed only with loosely defined traditional functions—might bypass these elaborate arrangements through the device of an injunction suit. Such a notion would be quite inconsistent with the act's expressed design to achieve "coordination" and "regional control" of water pollution. (§ 13000.)

██ To be sure, an injunction suit by the Attorney Gen-

eral is part of this statutory plan. Before he acts under the statute the following statutory preliminaries must occur:

| | | Section |
|---|---|---|
| 1. | Control board prescribes requirements | 13053-13055 |
| 2. | Violation occurs | 13060 |
| 3. | Board issues cease and desist order | 13060 |
| 4. | Violation of cease and desist order | 13063 |
| 5. | Control board certifies to district attorney | 13063 |
| 6. | Complaint to Attorney General of district attorney's inaction | 13063 |
| 7. | Investigation by Attorney General | 13063 |
| 8. | Attorney General's finding of district attorney's inaction | 13063 |

At that juncture, says section 13063, ". . . the Attorney General shall diligently prosecute the action . . . and in such case he shall have the powers and duties of the district attorney."

If we look to the Department of Fish and Game, which is specifically charged with the protection of fish life, we find that section 5651 of the Fish and Game Code in mandatory terms directs the department to refer chronic pollution to the regional water pollution board which shall then obtain correction *in accordance with its own statutory procedures.* Section 5651 thus envisions the same series of administrative occurrences which we have just described. ■■■ Apparently then, the Fish and Game Department, represented by the Attorney General as its statutory counsel, may not itself maintain a civil action to abate stream pollution. (See 33 Ops.Cal.Atty.Gen.77.) The Legislature hardly intended the department to leap the statutory hedgerow by the simple expedient of requesting the Attorney General to file an abatement action in the name of "the people."

The strongly administrative approach to pollution and nuisance correction contrasts markedly with the peremptory controls provided for hazards to the public health. The Dickey Water Pollution Act says that water contamination, i.e., an actual hazard to public health, is to be referred to the health authorities and not attacked directly by the pollution control boards. (Wat.Code, §§ 13025, 13052, subd. (g).) Under a companion statute, adopted concurrently with the Dickey Act, the health authorities may issue peremptory correction orders and take summary court action to abate water contamination. (Health & Saf. Code, § 5460.)

The legislative concept becomes evident at this point. Right or wrong, the concept is that "regional" administrative action is the selected governmental device for preventing water pollution and nuisance; that overlapping assertions of jurisdiction by state agencies with separate and sometimes conflicting demands upon waste dischargers, are to be replaced by "coordination" achieved through the regional boards; that desirability of the administrative approach outweighs the disadvantages of lost time and possible isolated instances of damaged water; that resort to the civil courts on the part of agencies of the state is reserved to the water pollution boards for utilization when administrative solutions have failed. This description of the statutory objectives is confirmed by the report of the legislative committee which evolved and proposed the Dickey Act. (Report of Assembly Interim Fact-Finding Committee on Water Pollution (1949) pp. 32, 36, 79, 108; see also Report of the Subcommittee on Bay and Water Pollution (1959), Appendix to Assembly Journal 1959 Regular Session.)

Section 13080, added in 1959, qualifies this concept in a limited respect and confirms it in others. For the first time it injects authorization for summary court action for pollution control. It is aimed at situations comparable to that involved here where the pollution "is transitory in nature or is of short duration but periodic in occurrence." Yet it emphasizes the regional or local focus of the law by placing the lawsuit in the hands of the district attorney. State agencies, including the Attorney General as an independent agency or as statutory counsel to another agency, are to continue to "coordinate" pollution control through the medium of the regional boards.

Thus the present action attempts invasion of a field fully covered by statutory regulations which leave no room for it and indeed exclude it.

Judgment affirmed.

Pierce, P. J., and Schottky, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 3, 1963. Peek, J., did not participate therein.