[No. H033228. Sixth Dist. June 3, 2010.]

TWC STORAGE, LLC, Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of parts III.B. and III.C.

**Counsel**

Silicon Valley Law Group and Jeffrey S. Lawson for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Mary Hackenbracht, Assistant Attorney General, John Davidson and Anita E. Ruud, Deputy Attorneys General, for Defendants and Respondents.

**Opinion**

**MIHARA, J.**—Appellant TWC Storage, LLC (TWC), challenges the superior court's denial of its petition for a writ of administrative mandate. TWC's

petition challenged the imposition of a $25,000 fine on it by respondent Regional Water Quality Control Board for the San Francisco Bay Region (the Regional Board). The fine was based on a chemical spill on TWC's property that infiltrated the groundwater. TWC claims that the Regional Board abused its discretion in imposing the fine because neither the law nor the facts supported the imposition of the fine. TWC also contends that it was deprived of due process and a fair hearing at the administrative hearing before the Regional Board. In the published portion of our opinion, we conclude that the Regional Board properly applied the relevant statutes. In the remainder of our opinion, we reject TWC's challenges to the conduct of the administrative hearing.

## I. Factual Background

In 2004, TWC purchased real property (the property) which had been used in the 1970's and 1980's for semiconductor manufacturing. In 1987, the 3.28-acre property was identified as a "Superfund" site due to the presence of volatile organic chemicals (VOC's) in the soil and groundwater. The property has been unoccupied since 1991. A two-story building on the property was next to a play yard at a daycare center for children which was operated on an adjacent property.

TWC wished to demolish the two-story building on the property. Two transformers were attached to that building. The transformers were not hidden. TWC hired a general contractor, Qualogy Construction, Inc. (QCI), to handle the demolition. TWC told QCI that all known hazardous materials had been removed from the site.[1] QCI hired a demolition subcontractor, Campanella Corporation (Campanella), to demolish the building.

On the morning of Friday, July 15, 2005, a Campanella equipment operator was demolishing the "utility area" where the transformers were attached to the building on the property. The transformers were located approximately 30 feet from the daycare center's play yard. It is a "standard and common practice to check for and drain liquids out of transformers prior to demolition or dismantling." The transformers had not been checked or drained. Using an excavator, the equipment operator removed and damaged one of the transformers. A liquid began spilling out of the damaged transformer.

The exterior of the damaged transformer was clearly labeled "PERCLENE FILLED" in large stenciled letters. Perclene is the "commercial name" for perchloroethylene (PCE). PCE is a "highly toxic contaminant." The equipment operator placed the damaged transformer on top of a "soils pile" to

---

[1] TWC did notify QCI of asbestos materials, which QCI then removed.

drain. He subsequently moved the damaged transformer to another area to "fully drain out/dry out." QCI was informed of the spill within an hour or two of its occurrence. QCI immediately monitored the area, detected high levels of VOC's, and instructed its crews to vacate the area.

TWC was notified of the spill at 11:05 a.m. on July 15, about an hour or two after the spill. By that afternoon, TWC was aware that at least 50 gallons of PCE had spilled from the damaged transformer, and TWC had been advised to notify "the US EPA" (the United States Environmental Protection Agency) immediately. TWC did not immediately notify any governmental agency. TWC did contact an environmental cleanup company, and some cleanup commenced two days later on July 17.

Sunnyvale Public Safety Officer Ron Staricha visited the property on the morning of July 19 as part of his routine monitoring of the demolition to ensure that it was in compliance with the demolition permit's dust control measure. Staricha noticed drums on the property labeled as "hazardous waste" that had not been present five days earlier when Staricha had last visited the property. QCI's president, who was present on the property, informed Staricha of the PCE spill. When Staricha asked why the City of Sunnyvale had not been notified of the spill, QCI's president asserted that TWC had notified "OES [Office of Emergency Services] and USEPA" on July 18. Staricha subsequently discovered that TWC's telephone notifications were made after Staricha arrived on the property on July 19. No governmental agency had been notified of the spill prior to Staricha's July 19 visit to the property.[2]

TWC thereafter engaged in investigation and cleanup efforts to address the effects of the spill. Nevertheless, an October 2005 sampling of the groundwater at the property detected a very high level of PCE close to the location of the transformer spill. The PCE level detected at that time was 12,000 micrograms per liter. In contrast, the PCE level had not exceeded 24 micrograms per liter over the previous decade.[3]

## II. Procedural Background

In January 2006, the Regional Board issued a complaint for administrative civil liability against TWC for violations of Water Code sections 13264, 13265, subdivision (c), and 13350, subdivision (b)(1). The complaint alleged that TWC had violated the Water Code by discharging PCE "into waters of

---

[2] TWC claimed that it had notified these agencies on July 18, but it could provide no verification of that claim.

[3] The maximum allowable contaminant level in California for PCE in drinking water is 5 micrograms per liter.

the State" beginning on July 15, 2005, without filing a report of waste discharge (ROWD). The complaint sought imposition of a $40,000 fine on TWC.

At the hearing before the Regional Board, TWC presented a witness who testified that it was "virtually unheard of" for a transformer to contain PCE. This witness also asserted that "Perclene" is "not readily recognized by anybody" as referring to PCE, and he claimed that the "PERCLENE FILLED" marking on the transformer was "faint."

In May 2006, the Regional Board issued an order imposing a $25,000 fine on TWC. The Regional Board found that TWC had violated both Water Code section 13264 and Water Code section 13350, subdivision (b)(1). The Regional Board made factual findings that TWC had damaged the transformer, initiating a PCE spill that infiltrated a groundwater aquifer, and left the transformer leaking PCE for four days before notifying OES of the spill. The Regional Board's order incorporated the staff report by reference.

In June 2006, TWC petitioned the State Water Resources Control Board (the State Board) for review of the Regional Board's order. The State Board dismissed this petition in December 2006. In January 2007, TWC filed a petition for a writ of administrative mandate in the superior court. TWC argued to the superior court that the Regional Board's decision was an abuse of discretion because the Regional Board had (1) improperly applied the relevant statutes, (2) violated TWC's right to due process at the hearing, and (3) failed to provide TWC with a fair hearing because the "legal instructions" to the board were erroneous. TWC's petition was tried to the court. In June 2008, the court issued a judgment denying the petition.[4] TWC filed a timely notice of appeal.

## III. Discussion

TWC raises three categories of issues on appeal. It claims that (1) the Regional Board improperly applied the relevant statutes, (2) the conduct of the hearing before the Regional Board violated due process, and (3) the "instructions" given to the Regional Board by its legal adviser were prejudicially erroneous.

The first question is what standard of review we apply to the superior court's decision. Judicial review of the Regional Board's decision by the

---

[4] In July 2008, TWC filed a request for a statement of decision. This request was denied as untimely.

superior court "extend[ed] to the questions whether the respondent ha[d] proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) On appeal, we review the superior court's decision under the substantial evidence standard of review. (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058 [48 Cal.Rptr.3d 563].) We exercise independent review on the question of whether the Regional Board provided TWC with a fair hearing. (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1442 [282 Cal.Rptr. 819].)

## A. Regional Board's Application of Statutes

The Regional Board found that TWC had violated both Water Code section 13264 and Water Code section 13350, subdivision (b). TWC claims that the record lacks substantial evidence to support the Regional Board's findings.

### 1. Water Code Section 13350, Subdivision (b) Violation

TWC argues that there is no evidence that TWC "caused or permitted" the PCE discharge into the groundwater in violation of Water Code section 13350, subdivision (b). "Any person who, *without regard to intent or negligence, causes or permits* any hazardous substance to be discharged in or on any of the waters of the state, except in accordance with waste discharge requirements or other provisions of this division, shall be strictly liable civilly . . . ."[5] (Wat. Code, § 13350, subd. (b)(1), italics added.)

TWC relies heavily on *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 [13 Cal.Rptr.3d 865] (*Modesto*) to support its claim that Water Code section 13350 does not apply to a party who "take[s] no active role in the activities leading up to the discharge." *Modesto* does not support this proposition.

---

[5] "The state board or a regional board may impose civil liability administratively pursuant to Article 2.5 (commencing with Section 13323) of Chapter 5 either on a daily basis or on a per gallon basis, but not both. [¶] (1) The civil liability on a daily basis may not exceed five thousand dollars ($5,000) for each day the violation occurs." (Wat. Code, § 13350, subd. (e).)

The issue in *Modesto* was whether the defendants, none of which were landowners, were "responsible parties" under Water Code section 13304, subdivision (a). (*Modesto, supra*, 119 Cal.App.4th at p. 35.) Water Code section 13304, subdivision (a) provides that a person is responsible for cleanup and abatement if the person "causes or permits" a discharge that "creates, or threatens to create, a condition of pollution or nuisance." (Wat. Code, § 13304, subd. (a); see *Modesto*, at p. 35.) In *Modesto*, the First District Court of Appeal's interpretation of this statutory language was guided by its prior decision in *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605 [200 Cal.Rptr. 575] (*Leslie Salt*).

In *Leslie Salt*, the court construed a statute which allowed a cease and desist order to be issued to any person who had " 'undertaken' " to " 'place[] fill' " without the requisite permit. (*Leslie Salt, supra*, 153 Cal.App.3d at p. 612.) In *Leslie Salt*, the plaintiff, which was the landowner, focused on the word " 'undertaken' " and contended that the statute did not apply to anyone "other than the one who actually placed the fill." (*Leslie Salt*, at p. 612.) The First District held in *Leslie Salt* that the statute applied to "landowners regardless whether they actually placed the fill or know its origin." (*Leslie Salt*, at p. 617.) "[L]iability and the duty to take affirmative action flow not from the landowner's active responsibility for a condition of his land that causes widespread harm to others or his knowledge of or intent to cause such harm but rather, and quite simply, from his very possession and control of the land in question." (*Leslie Salt*, at p. 622.)

In *Modesto*, the First District's analysis focused on whether the defendants could be held liable for creation of a "nuisance" within the meaning of the statutory language. (*Modesto, supra*, 119 Cal.App.4th at p. 37.) The First District rejected the defendants' contention that "only those who are physically engaged in a discharge or have the ability to control waste disposal activities" can be held liable for the nuisance that discharge creates. (*Modesto*, at p. 41.) The First District held that those of the nonlandowner defendants "who took affirmative steps directed toward the improper discharge . . . may be liable under that statute, but those who merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal" could not be held liable under the statute. (*Modesto*, at p. 43.)

We can find nothing in *Modesto* that supports TWC's claim that a *landowner* cannot be held liable for a discharge unless it took an "active role" in the creation of the discharge. *Modesto* itself did not involve the issue of a

landowner's liability, and *Leslie Salt*, upon which *Modesto* was based, explicitly held that a landowner could be held liable based solely on the landowner's possession and control of the land.

■ Here, there was substantial evidence that TWC "cause[d] or permit[ted]" the discharge to occur by engaging contractors to perform the demolition activity that resulted in the discharge. Although TWC contends that it could not be liable because it did not "actively participate in the demolition activities" or "fail[] to take reasonable care," Water Code section 13350, subdivision (b) plainly provides that any person who "causes or permits" a discharge is "strictly liable" "without regard to intent or negligence."

TWC claims that it may not be held liable under Water Code section 13350 because the discharge occurred as a result of its *independent contractors'* negligent acts, and it suggests that a property owner cannot be held liable for the acts of an independent contractor. The question here is not whether TWC may be held liable in tort for acts of an independent contractor, but whether the specific statutes under which the Regional Board imposed administrative fines extended to TWC. TWC cites no statutory or case authority to support its claim that a property owner who causes or permits a discharge may not be fined if the discharge was actually perpetrated by an independent contractor. TWC asserts: "The law in California is that fines are not imputed to persons who contract with independent contractors." However, it provides no support for that proposition. TWC's reliance on *McDonald v. Shell Oil Co.* (1955) 44 Cal.2d 785 [285 P.2d 902] (*McDonald*) is inapt. The issue in *McDonald* was whether the employee of an independent contractor could recover tort damages from the hirer of the independent contractor. (*McDonald*, at p. 787.) *McDonald* did not concern the issue before us, whether a fine may be imposed on a landowner who "causes or permits" a prohibited discharge. Since, under Water Code section 13350, TWC was *strictly liable* for the discharge, it cannot be absolved simply because its contractors were negligent or also could be held liable for the discharge.

## 2. Water Code Section 13264, Subdivision (a) Violation

TWC also attacks the Regional Board's finding that TWC violated Water Code section 13264. "No person shall *initiate* any new discharge of waste . . . prior to the filing of the report required by Section 13260 . . . ."[6] (Wat. Code, § 13264, subd. (a), italics added.)

---

[6] "Civil liability may be administratively imposed by a regional board in accordance with Article 2.5 (commencing with Section 13323) of Chapter 5 for a violation of subdivision (c) in an amount which shall not exceed five thousand dollars ($5,000) for each day in which the violation occurs." (Wat. Code, § 13265, subd. (d)(1).)

■ TWC seems to suggest that it could not be found to have violated Water Code section 13264 because it was not negligent. Lack of negligence is a defense to a Water Code section 13264 violation only "if the discharger is not negligent *and* immediately files a report of the discharge with the board." (Wat. Code, § 13265, subd. (c).) TWC did *not* immediately file a report of the discharge with the Regional Board, so it could not avail itself of this defense.

TWC argues that it could not be fined for the discharge under Water Code section 13264, subdivision (a) because it did not *know* that the PCE had *reached the groundwater* at any time during the four-day period upon which the fine was based. TWC claims that the Regional Board lacked jurisdiction over the discharge because the discharge was "not to the waters of the state." We note that the Regional Board has jurisdiction over "waters of the state," and "waters of the state" is not limited to groundwater but includes "any surface water or groundwater, including saline waters, within the boundaries of the state." (Wat. Code, § 13050, subd. (e).) In any case, TWC's contention does not raise a jurisdictional issue, but an issue about the sufficiency of the evidence. The evidence before the Regional Board established that TWC knew that a large volume of PCE had been discharged onto its property, and the Regional Board could have drawn a reasonable inference from this evidence that TWC was aware that the PCE would quickly infiltrate the groundwater, especially since the water table was very shallow under TWC's property.

TWC complains that the Regional Board was improperly punishing it for failing to report the discharge to the OES rather than for failing to file the report that was required prior to the discharge under Water Code section 13264. This complaint lacks substance. TWC admits that it *never* filed the report required by Water Code section 13264. If anything, the Regional Board treated TWC leniently by penalizing it for only the four-day period that preceded TWC's OES report.

■ TWC asserts that it was not required to file a report because Water Code section 13264 requires a report to be filed for only a "planned discharge" rather than an "accidental" discharge. Nothing in the statutory language supports this assertion. Water Code section 13264 bars any discharge that occurs before a report is filed. (Wat. Code, § 13264, subd. (a).) While it is true that it would not be possible to report an accidental discharge in advance, the statute clearly was intended to provide a safe harbor only for those planned discharges that are reported in advance so that the Regional Board can ensure that precautions are taken. An unplanned discharge precludes precautions and falls plainly within the scope of Water Code section 13264.

**B., C.***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. Disposition

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.

On June 29, 2010, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 15, 2010, S184399. Baxter, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 291.