Filed 6/18/19

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SAN DIEGO REGIONAL WATER QUALITY CONTROL BOARD,<br><br>    Defendant and Respondent. | D073968<br><br>(Super. Ct. No. 37-2015-00032608-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.


San Diego Gas & Electric Company, David Barrett, Adrianna B. Kripke; Alston & Bird, Ward L. Benshoof and Geoffrey C. Rathgeber for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Michael P. Cayaban and Joshua M. Caplan, Deputy Attorneys General, for Defendant and Respondent.

For many years, San Diego Gas & Electric Company (SDG&E) operated a power plant on the north side of San Diego Bay (Bay) and, in connection with its power plant operations, discharged waste into the Bay. The discharged waste consisted of various metals and toxic chemical compounds, which settled into the Bay's sediment and accumulated there along with similar waste discharged by unrelated shipyard companies. The accumulated pollutants adversely impact the beneficial uses of water, threatening aquatic life, aquatic-dependent wildlife, and human health.

After years of investigation, the government agency tasked with monitoring water quality, San Diego Regional Water Quality Control Board (Regional Board), issued a cleanup and abatement order (CAO) to SDG&E and several other entities. The Regional Board found that SDG&E caused or permitted waste to be discharged into the Bay and thereby created, or threatened to create, pollution and nuisance conditions. (Wat. Code, § 13304.)[1]

SDG&E contested its designation as a responsible "person" under section 13304, subdivision (a). It claimed the Regional Board had not demonstrated, by substantial evidence, that SDG&E's actions were a substantial factor in creating, or threatening to create, a condition of pollution or nuisance. SDG&E filed a petition for writ of mandate in superior court to have the CAO vacated, which was denied. SDG&E argued then, as it does now, that shipyard companies comparatively discharged greater amounts of pollutants into the Bay and that two appellate opinions require application of the

_____

[1]     Further unspecified statutory references are to the Water Code.

2

"substantial factor" causation test to determine whether SDG&E created or threatened to create a condition of pollution or nuisance. (See *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 (*Modesto I*); *City of Modesto v. Dow Chemical Co.* (2018) 19 Cal.App.5th 130 (*Modesto II*).)

As we explain, the Regional Board was required to establish two elements prior to issuing the CAO to SDG&E: (1) that SDG&E "caused or permitted . . . waste to be discharged or deposited" into state waters (discharge element), and (2) that the discharged waste "creates, or threatens to create," pollution or nuisance conditions (nuisance creation element). (§ 13304, subd. (a).) The disputed nuisance creation element of section 13304—"creates, or threatens to create, a condition of pollution or nuisance"—does not require application of the common law substantial factor test for causation. It is undisputed on appeal that SDG&E directly discharged and thus "caused or permitted" waste to enter the Bay, distinguishing the *Modesto* cases. Further, the Regional Board adequately demonstrated that the waste discharged by SDG&E created, or threatened to create, a condition of pollution or nuisance. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Regional Board's factual findings, contained in a technical report and incorporated by reference in the CAO, are not challenged on appeal. We provide a high-level overview of the facts as context for our discussion.

Between approximately 1943 and the 1990s, SDG&E owned and operated the Silver Gate Power Plant, located on the north side of the Bay site that was studied by the Regional Board, the "Shipyard Sediment Site." The plant was closed and demolished in

3

the 2000s. While the power plant operated, SDG&E maintained an easement to the Bay for cooling water discharge lines (cooling tunnels); the cooling tunnels were needed to deliver and remove about 120 to 180 million gallons of seawater per day used to cool SDG&E's eight steam turbine electrical generators. In connection with plant operations, SDG&E generated waste, including metals (chromium, copper, lead, nickel, and zinc); polychlorinated biphenyls (PCBs); polynuclear aromatic hydrocarbons; and total petroleum hydrocarbons (collectively, pollutants).

In 2012, culminating a years-long investigation and administrative process, the Regional Board found that SDG&E had discharged pollutants into the Bay, at least as follows: (1) through the cooling tunnels; (2) into surface soils at a substation/switchyard that flowed into the Bay with storm water run-off via a storm drain; and (3) into open pits in close proximity to the Bay (wastewater ponds), which overflowed to the Bay and, at one time, wastewater from one of the ponds flowed directly to the Bay through a trench.[2] The Regional Board found that SDG&E "caused or permitted waste . . . to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance."

_____

[2]    We do not attempt to summarize the ample evidence, both quantitative and qualitative, describing how SDG&E generated pollutants, how the pollutants were tested and detected in various locations, and how, over the course of at least 30 years, the pollutants inevitably drained and discharged into the Bay.

4

The Regional Board's 2012 technical report, which was subject to numerous revisions since 2005, is well over 2,000 pages.[3] The report concludes that several different entities, including SDG&E, had "each caused or permitted the discharge of waste to the Shipyard Sediment Site resulting in the accumulation of waste in the marine sediment."[4] The accumulated pollutants in the marine sediment created conditions of pollution or nuisance by "adversely impact[ing] beneficial uses corresponding to three target receptors: aquatic life, aquatic-dependent wildlife, and human health." The technical report discusses, in voluminous, extensive detail, the harm that has occurred or is likely to occur due to the elevated level of pollutants in the Shipyard Sediment Site.

As only one example, PCBs are carcinogenic and potentially hazardous to human health depending on exposure level.[5] The Regional Board collected fish and shellfish located in the Shipyard Sediment Site, measured chemical concentrations in the specimens, and found that ingesting the contaminated seafood poses a theoretical

---

[3] The administrative record in this case is over half a million pages.

[4] Conversely, the Regional Board found that certain other entities had *not* "contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to *levels*, which create, or threaten to create, conditions of pollution or nuisance." (Emphasis added.) We reasonably infer, and the record supports, the opposite is true of SDG&E, i.e., that SDG&E contributed to the accumulation of pollutants at sufficiently high levels, which created, or threatened to create, pollution or nuisance conditions.

[5] The Regional Board noted that "fish and other aquatic organisms are exposed to PCBs through direct intake of contaminated water and sediment, or through consumption of contaminated food. PCBs have the potential to bioaccumulate in organisms and biomagnify through the food chain."

increased risk of cancer to recreational and subsistence anglers compared to seafood caught from other areas. The technical report indicates that risks to human health increase as fish and shellfish (and people, through ingestion) are exposed to higher concentration levels of PCBs.

The Regional Board determined that SDG&E leaked and spilled large quantities of PCBs (identified by specific chemical markers) during SDG&E's routine operations over several decades. The Board traced the chemical markers of PCBs to SDG&E's cooling tunnels, switchyard, and wastewater ponds, which drained or flowed into the Bay. Based on reasonable inferences and assumptions, the Board found that SDG&E caused or permitted a discharge of waste into the Bay that created, or threatened to create, a condition of pollution or nuisance.

During the Regional Board's administrative process, SDG&E contested it was a responsible "person" under section 13304. SDG&E admitted to discharging pollutants into the Bay; however, it claimed that its contribution of pollutants was not a substantial factor in creating a condition of pollution or nuisance. To support its position, SDG&E pointed to higher levels of pollutants discharged by unrelated shipyard companies and presented expert opinion testimony that SDG&E's discharges alone were insufficient to have caused pollution or nuisance conditions. The Regional Board considered and rejected SDG&E's argument, finding it was "not a defense to liability under the [CAO]. The argument amounts to an admission that SDG&E *contributed* to the condition of pollution or nuisance by adding [pollutants] that caused impairment to beneficial uses to San Diego Bay, even if some other discharger added more [pollutants] to the Bay than it

did.  SDG&E's arguments are relevant to an allocation [of liability]—not to whether it is properly named as a responsible party."  The Regional Board highlighted numerous pieces of evidence in the administrative record supporting its decision to name SDG&E as a responsible party.

SDG&E filed a petition for writ of mandate in superior court to have the CAO vacated.  The petition alleged the Regional Board erred as a matter of law in subjecting SDG&E to the CAO without finding that SDG&E was a " 'substantial factor' " in creating, or threatening to create, a condition of pollution or nuisance.  The superior court denied SDG&E's writ petition.  This appeal followed.

DISCUSSION

*Background of Section 13304*

When construing any statute, our task is to determine the Legislature's intent when it enacted the statute " 'so that we may adopt the construction that best effectuates the purpose of the law.' "  (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 625 (*City of Burbank*).)  In doing this, we look to the statutory language, which ordinarily is " 'the most reliable indicator of legislative intent.' "  (*Ibid*.)  We must also analyze section 13304, at issue here, in the context of the statutory scheme of which it is a part.  (*City of Burbank*, at p. 625.)  In analyzing the legislative usage of certain words, " 'the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in . . . interpretation[.]' "  (*People ex rel. San Francisco Bay Conservation & Development Com. v. Emeryville* (1968) 69 Cal.2d 533, 543.)

7

Section 13304 is part of the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; § 13000 et seq.). (Stats. 1969, ch. 482, § 18, p. 1051.) The Legislature's goal in enacting the Porter-Cologne Act was "to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (§ 13000; *City of Burbank*, *supra*, 35 Cal.4th at p. 619.) The task of accomplishing this goal belongs to state and regional boards, which together comprise "the principal state agencies with primary responsibility for the coordination and control of water quality." (§ 13001; *City of Burbank*, at p. 619.) The Legislature declared that the "state must be prepared to exercise its full power and jurisdiction to protect the quality of waters in the state from degradation. . . ." (§ 13000.)

As initially enacted in 1969, section 13304, subdivision (a) provided as follows in pertinent part: "Any person who . . . intentionally or negligently causes or permits any waste to be deposited where it is discharged into the waters of the state and creates a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof."[6] (Stats. 1969, ch. 482, p. 1066.)

The section was amended the following year to read as follows in relevant part: "Any person who . . . intentionally or negligently causes or permits any waste to be discharged or deposited where it is, or *probably will be*, discharged into the waters of the state and creates, or *threatens to create*, a condition of pollution or nuisance, shall upon

---

[6]      Under the Porter-Cologne Act, " 'person,' " " 'waste,' " " 'pollution,' " and " 'nuisance' " are defined terms. (§ 13050.)

8

order of the regional board clean up such waste or abate the effects thereof." (Stats. 1970, ch. 918, § 5.3, p. 1669, italics added.)

The section was again amended in 1971 to read as follows in relevant part: "Any person who . . . intentionally or negligently causes or permits any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof or, *in the case of threatened pollution or nuisance, take other necessary remedial action*." (Stats. 1971, ch. 1288, § 11, p. 2525, italics added.)

In 1980, section 13304 was amended to nearly its present-day form, and provided as follows in pertinent part: "Any person who . . . has *caused or permitted, causes or permits, or threatens to cause or permit* any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof or, in the case of threatened pollution or nuisance, take other necessary remedial action." (Stats. 1980, ch. 808, § 3, p. 2538, italics added.) The Legislature also defined " 'threaten' " for purposes of the section as "a condition creating a substantial probability of harm, when the probability and potential extent of harm make it reasonably necessary to take immediate action to prevent, reduce,

9

or mitigate damages to persons, property, or natural resources."[7]  (Stats. 1980, ch. 808, § 3, p. 2539.)

Nowhere in the Porter-Cologne Act, including in any of the enacted versions of section 13304, are the words "substantial factor causation" used or referenced; certainly, the Legislature did not explicitly require a finding of substantial factor causation prior to a regional board's issuing a cleanup or abatement order.  Moreover, changes made to the statute's language over time evince a legislative intent to expand the regional boards' ability to name responsible persons.  For example, cleanup or abatement orders may be issued to past, present, and future dischargers of waste; the boards need not prove a person's intent in discharging waste (the words "intentionally or negligently" were deleted by the 1980 amendment); and the Legislature empowered regional boards to issue orders to prevent and/or correct threatened harm, that is, when waste has not yet even reached the state's waters.  As we explain, these and other considerations lead us to the conclusion that the Legislature did not intend for the substantial factor causation test to apply to the nuisance creation element.

*Common Law of Nuisance*

---

[7]     The relevant language of section 13304, subdivision (a) in effect at the time the Regional Board issued its CAO stated:  "Any person who . . . has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, *including, but not limited to, overseeing cleanup and abatement efforts*."  (Stats. 2003, ch. 614, § 2, italics added.) Current section 13304, subdivision (a), is substantially similar.  (Stats. 2014, ch. 739, § 1, eff. Jan. 1, 2015.)

10

SDG&E contends that section 13304, subdivision (a) must be construed in light of common law nuisance principles (e.g., *Modesto I*, *supra*, 119 Cal.App.4th at p. 38) and that a showing of causation of harm under the substantial factor test is necessary in public nuisance claims (see CACI No. 2020). These are uncontroversial general propositions. "The language of the Restatement [Second of Torts] presumes that the necessary elements for proof of a cause of action for public nuisance include the existence of a duty and causation. [Citation.] 'The conduct necessary to make the actor liable for either a public or a private nuisance may consist of (a) an act; or (b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest.' [Citation.] . . . A connecting element to the prohibited harm must be shown." (*In re Firearm Cases* (2005) 126 Cal.App.4th 959, 988.)

In California tort actions, the substantial factor test is used to determine the element of causation. (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 342.) A defendant's conduct is not a substantial factor in bringing about harm if the harm would have resulted even if the defendant had not acted, unless the defendant is a concurrent independent cause. (*Id.* at pp. 342-343.) "The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct. [Citations.] The substantial factor standard . . . subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact."

11

(*Rutherford v. Owens-Illnois, Inc.* (1997) 16 Cal.4th 953, 969; see also *People v. Caldwell* (1984) 36 Cal.3d 210, 220 [discussing substantial factor test in determining proximate cause of person's death].)

Nevertheless, we are not convinced the common law of nuisance is as confined as SDG&E suggests, particularly where, as here, a state agency seeks to abate the act and effects of water pollution. Predating the enactment of section 13304, the California Supreme Court was confronted with various nuisance cases involving state efforts to enjoin the actual and threatened pollution of rivers and streams. The court approved the "equitable principle that, in an action to abate a public or private nuisance, all persons engaged in the commission of the wrongful acts which constitute the nuisance may be enjoined, jointly or severally. It is the nuisance itself, which, if destructive of public or private rights of property, may be enjoined." (*People v. Gold Run Ditch & Mining Co.* (1884) 66 Cal. 138, 149 (*Gold Run*).)

We recite the facts of *Gold Run* at length given the parallels to the instant case. There, a mining company had for at least a five-month period of the past eight years discharged its mining materials into a state river. (*Gold Run*, *supra*, 66 Cal. 138 at p. 144.) "Of the material thus discharged into the river a large portion has been washed, from the place of discharge or dump, down the river, and, 'commingled with tailings from other hydraulic mines; and still other material, which is the product of natural erosion, has been deposited in the beds and channels of the American and Sacramento rivers and their confluents, but mostly in the American, and upon lands adjacent to both rivers.' " (*Ibid.*) The state rivers were in danger "if the acts of the defendant and others engaged in

12

hydraulic mining [were] allowed to continue." (*Id.* at p. 145.) The issue before the California Supreme Court was whether the defendant's acts could be enjoined even though defendant's acts, alone, did not cause the resulting nuisance; the nuisance was found by the trial court to be "the result of the *aggregate* of mining debris dumped into the stream by the defendant and other mining companies, acting separately and independently of each other . . . ." (*Id.* at p. 148, italics added.)

Our high court concluded that, even without a finding that any defendant had materially contributed to the nuisance, each mining defendant could be enjoined from continuing its discharging acts:

> " 'It is no answer to a complaint of nuisance, that a great many others are committing similar acts of nuisance. Each and every one is liable to a separate action, and to be restrained. * * * The extent to which the appellee has contributed to the nuisance may be slight, and scarcely appreciable. Standing alone, it might well be that it would only very slightly, if at all, prove a source of annoyance. And so it might be, as to each of the other numerous persons contributing to the nuisance. Each standing alone might amount to little or nothing. But it is when all are united together, and contribute to a common result, that they become important, as factors, in producing the mischief complained of. And it may only be after, from year to year, the number of contributors to the injury has greatly increased, that sufficient disturbance of rights has been caused to justify a complaint. * * * In that state of facts * * * each element of contributive injury is a part of one common whole; and to stop the mischief in the whole, each part in detail must be arrested and removed.' "

(*Gold Run*, *supra*, 66 Cal. at p. 150.) The court further declared: "[H]owever long [the public nuisance] continue[s], the State is bound to protect the people; and for that purpose the attorney general, as the law officer of the State, has the power to institute a

13

proceeding in equity in the name of the people, to compel the discontinuance of the acts which constitute the nuisance." (*Id.* at p. 152.)

In another abatement action, *People ex rel. Ricks Water Co. v. Elk River Mill & Lumber Co.* (1895) 107 Cal. 214 (*Elk River Mill*), it was averred " 'that . . . defendant has *caused and permitted*, and does *cause and permit*, all sewage, offal, waste, and fetid matter from [a] sawmill, cookhouse, and stables to be drained and deposited in the waters of [a] stream, and continues to do so, thereby contaminating, polluting, and rendering the same unwholesome and unfit for culinary and other generally domestic purposes, and offensive to the senses.' " (*Id.* at p. 218, italics added.) Specifically, the trial court found that defendant allowed "droppings" from 25 to 30 cows and 25 hogs to accumulate on a stream bank, where the droppings would "find their way" into the stream. (*Id.* at pp. 218-219.) The California Supreme Court discussed that defendant's use of land and the stream in this manner was unreasonable and that "[t]he acts enjoined are equivalent to actually putting the polluting material directly into the water." (*Id.* at p. 220.) The court approved the abatement of defendant's acts, citing the "effect of the rule laid down in" *Gold Run*. (*Ibid.*)

In *People v. Truckee Lumber Co.* (1897) 116 Cal. 397 (*Truckee Lumber*), our Supreme Court again affirmed the issuance of an injunction to abate defendant's acts in a public nuisance case as requested by the attorney general. (*Id.* at p. 399.) The court reasoned that defendant's disposal of "sawdust, shavings, slabs, edgings, waste, and other deleterious substances" into a state river, having the general "effect of polluting and poisoning the waters of the river, and thereby killing and destroying the fish therein," was

14

a public nuisance subject to abatement even if there had been no demonstrable injury to any private landowner. (*Id.* at pp. 399-400.) The court's decision turned on how defendant's acts, if unabated, would "greatly interfere[] with and impair[]" the common use of public waters. (*Id.* at pp. 400-401.)

In *People v. New Penn Mines, Inc.* (1963) 212 Cal.App.2d 667 (*New Penn Mines*), the court of appeal discussed how an owner of an inactive or abandoned mine may be held responsible for an actual or threatened pollution or nuisance condition when surface water or some other mechanism causes drainage of accumulated mine waste into a body of water. (*Id.* at p. 673.) The court noted, "In one sense the owner or person responsible for an inactive or abandoned mine is not actively 'discharging' industrial waste." (*Ibid.*) Nevertheless, the "drainage . . . falls within the administrative sphere and within the enforcement powers of the regional and state water pollution control boards." (*Ibid.*)

In each of the above cases, the defendant's acts were subject to abatement based on its causal connection to an actual or potential *discharge of waste* into state waters, where the discharged waste created, assisted in creating, or threatened to create, a nuisance. The decisions allow for the possibility that other actors, drainage mechanisms, or natural and unnatural occurrences, which were outside of the defendant's control, may also contribute to creating the complained of nuisance. The decisions do not require proof that the defendant's act was a "substantial factor" or "but for" cause of the resulting nuisance. (See *Gold Run*, *supra*, 66 Cal. at pp. 148-150 [defendant's acts sufficiently contributed to causing harm to riverbed]; see also *Hillman v. Newington* (1880) 57 Cal. 56, 59 ["the

15

nuisance results from the combined effect of all their operations; or rather, it is the aggregate result that is the nuisance"].)

We presume the Legislature was aware of *Gold Run* and like cases at the time section 13304 was enacted and amended. (E.g., *People v. Overstreet* (1986) 42 Cal.3d 891, 897 ["Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them" ' "]; *Burden v. Snowden* (1992) 2 Cal.4th 556, 564 ["When construing a statute, we may presume that the Legislature acts with knowledge of the opinions of the Attorney General which affect the subject matter of proposed legislation."].) Section 13304 clearly authorizes the attorney general to seek injunctions to compel compliance with cleanup or abatement orders. (§ 13304, subd. (a) ["Upon failure of any person to comply with the cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that county for the issuance of an injunction requiring the person to comply with the order."].) We see no indication the Legislature intended to depart from the rule of *Gold Run* or diminish the state's existing enforcement powers when it enacted and amended section 13304.

Our conclusion is bolstered by the Legislature's use of the words "caused *or permitted*" in section 13304, that is, persons may be subject to a cleanup or abatement order if they have "caused *or permitted*" a discharge of waste. (§ 13304, subd. (a), italics added.) Cases have interpreted this language broadly. In *TWC Storage, LLC v. State Water Resources Control Bd*. (2010) 185 Cal.App.4th 291, a landowner (TWC) was held

16

responsible for its independent contractor's chemical spill on TWC's property. (*Id.* at p. 298.) Although TWC was not found to be a "substantial factor" or "but for" cause of the chemical spill, the court concluded that TWC " 'cause[d] or permit[ted]' " the discharge to occur. (*Id.* at pp. 297-298 [referencing Water Code section 13350]; see also *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 622 [landowners may be held responsible when public nuisance develops on their land].)

Based on the foregoing considerations, we conclude that, under section 13304, the Regional Board was not required to apply the substantial factor test to the nuisance creation element. The test is not required by the statute's plain language, not reflected in legislative history, and not borne out by relevant case law, which support that a person may be subject to an abatement order without a finding that he or she was a substantial factor in creating the resulting nuisance. Prior to issuing a cleanup or abatement order, a regional board must establish a causal link or connection between a named responsible person and an actual or threatened *discharge of waste*.[8] (§ 13304, subd. (a); see *Gold Run*, *supra*, 66 Cal. at p. 144; *Elk River Mill*, *supra*, 107 Cal. at p. 218; *Truckee Lumber*, *supra*, 116 Cal. at p. 399; *New Penn Mines*, *supra*, 212 Cal.App.2d at p. 673.) To the extent necessary, the regional board also establishes that the actual or threatened

_____

[8]    We express no opinion on what test, if any, applies to this discharge element since SDG&E does not dispute on appeal that it "caused or permitted" waste to be discharged into the Shipyard Sediment Site. Indeed, such a challenge to the Regional Board's factual finding would be subject to a review for substantial evidence, and based on our review of the record, substantial evidence supports the finding that SDG&E discharged waste. SDG&E operated the Silver Gate Power Plant for years before any shipyard companies began discharging waste, and the Regional Board traced specified pollutants (e.g., chemical markers of PCBs) from SDG&E's facilities to the Bay.

17

discharge of waste created, or threatened to create, a condition of pollution or nuisance.[9]
As to this latter element, regional boards generally assess the impact or extent of harm
from the discharged waste (or threatened discharge) and determine whether remedial
action is reasonably necessary by the named person. (E.g., § 13050 [defining
" 'pollution' " and " 'nuisance' "]; § 13304, subd. (e) [defining " 'threaten' "].)

*The Modesto Cases*

SDG&E relies heavily on two cases decided by the First District Court of Appeal,
*Modesto I*, *supra*, 119 Cal.App.4th 28, and *Modesto II*, *supra*, 19 Cal.App.5th 130, to
support its position that the Regional Board was required to find that SDG&E was a
"substantial factor" in creating the nuisance at issue.

In *Modesto I*, the City of Modesto Redevelopment Agency (City) brought an
action against various defendants under the Polanco Redevelopment Act (Polanco Act;
Health & Saf. Code, § 33459 et seq.) for environmental contamination by dry cleaning
solvents. (*Modesto I*, *supra*, 119 Cal.App.4th at pp. 32-33.) The defendants fell into
three general groups: (1) manufacturers of solvents and equipment, (2) distributors of
solvents and equipment, and (3) dry cleaning retailers. (*Id.* at p. 33.) The Polanco Act
defines a " 'responsible party' " to include a person described by subdivision (a) of section
13304 of the Water Code; the trial court determined that certain manufacturers (group 1)
and distributors (group 2) were not responsible parties because they did not "cause" a

---

9      It is not necessary for regional boards to establish the nuisance creation element if
they are issuing orders to a person who has discharged waste in violation of a waste
discharge requirement or other order of a regional or state board. (§ 13304, subd. (a).)

discharge of solvents into public sewers. (*Id.* at pp. 34-36.) The court of appeal was presented with the question of who, among the manufacturer and distributor defendants, could be held responsible even though they did not have physical control over the discharged waste. (*Id.* at p. 36.) There was no question before the court whether dry cleaning retailers (group 3) could be responsible, presumably since they were the ones that "customarily dumped solvent wastewater into the public sewer systems," and directly allowed chlorinated solvents to "leak[] into the environment." (*Id.* at p. 33.)

The *Modesto I* opinion analyzed the "causes or permits" language of section 13304 consistent with nuisance law principles, under which liability extends " ' "not only [to] the party who maintains the nuisance . . . but also [to] the party or parties who create or assist in its creation . . . ." ' " (*Modesto I*, *supra*, 119 Cal.App.4th at p. 38.) Applying this principle, the court discussed that defendants in groups 1 and 2 could be held liable by "manufacturing a system designed to dispose of wastes improperly or by instructing users of its products to dispose of wastes improperly." (*Id.* at p. 43.) Conversely, defendants could not be held liable to the extent they "merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal." (*Ibid*.) The court did not adopt the substantial factor causation test vis-à-vis section 13304 nor did it specifically analyze the nuisance creation element. The trial court was directed to reconsider motions for summary adjudication filed by defendants in groups 1 and 2. (*Id.* at p. 45.)

Subsequently, the City appealed a judgment following a bench trial in favor of defendants from groups 1 and 2. (*Modesto II*, *supra*, 19 Cal.App.5th at pp. 135, 143.)

19

The issue before the *Modesto II* court was the proper measure of proof to support a finding of defendants' "causation" of pollution (i.e., the improper discharge of solvents). (*Id.* at p. 153.) The *Modesto II* court concluded that "direct proof of every link in the chain of causation, on a site-by-site and instruction-by-instruction basis, is not required. Liability can be proven by sufficient circumstantial evidence that would allow a reasonable fact finder to find that all of defendants' conduct—to include affirmative steps toward the discharge of toxic wastes—was a contributing factor to the pollution." (*Id.* at p. 156.) The court formulated the causation analysis for defendants in groups 1 and 2 as follows: "[C]onsidering the evidence as a whole, is it more likely than not that defendants' improper instructions [in waste disposal], and any other relevant conduct, were a substantial factor in causing the pollution." (*Id.* at p. 159.)

The *Modesto* cases do not support SDG&E's position that the substantial factor causation test must be applied to the nuisance creation element of section 13304. It was "not the subject of serious dispute" that the soils at Modesto dry cleaning sites were contaminated by discharged solvents and constituted a nuisance. (*Modesto II*, *supra*, 19 Cal.App.5th at p. 141.) The *Modesto* opinions discuss the issue of causation in the context of whether defendants who had no physical control over the discharged waste, i.e., groups 1 and 2, could be found a "cause" of the discharge based on the equipment they designed or instructions they gave. (*Modesto I*, *supra*, 119 Cal.App.4th at p. 36; *Modesto II*, *supra*, 19 Cal.App.5th at pp. 158-159.) Implicit in both *Modesto* decisions is that the dry cleaners, which directly discharged waste, could be held responsible. (E.g., *Modesto I*, *supra*, 119 Cal.App.4th at pp. 33, 36.)

20

As a result, SDG&E's reliance on the *Modesto* cases is misplaced. SDG&E's status in this case resembles that of *Modesto*'s dry cleaning retailers rather than the solvent manufacturers and distributors. Through its operation of a power plant, SDG&E directly discharged waste into state waters. Unlike some *Modesto* defendants, SDG&E's involvement in discharging waste can in no way be described as "remote and passive." (*Modesto I*, *supra*, 119 Cal.App.4th at p. 43.) The *Modesto* decisions do not stand for the proposition that a regional board must find a person was a substantial factor in creating a nuisance prior to issuing an abatement order to that person.

*Conclusion*

Under section 13304, subdivision (a), prior to issuing a cleanup or abatement order to a specified person, a regional board is required to establish a causal or connecting link between the person and an actual or threatened discharge of waste into state waters. In addition, the board must establish that the actual or threatened discharge of waste created, or threatened to create, a condition of pollution or nuisance. The nuisance creation element of section 13304 generally calls for an assessment of the impact or extent of harm from an actual or threatened discharge of waste and determination that remedial action is reasonably necessary by a named person.[10] (See, e.g., §§ 13050, 13304, subds. (a), (e).)

---

[10] Establishing the nuisance creation element is not necessary if an order is being issued to a person who has discharged waste "in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board[.]" (§ 13304, subd. (a).)

21

In this appeal, SDG&E did not dispute its discharge of waste into state waters, and it does not directly challenge the sufficiency of evidence to support the Regional Board's nuisance creation finding, urging instead that the Regional Board erred by failing to apply the substantial factor causation test. As we have discussed, the Regional Board was not required to apply the substantial factor causation test. Moreover, based on our independent review of the administrative record, we conclude that substantial evidence supports the Regional Board's finding that waste discharged by, and directly attributed to SDG&E, created, or threatened to create, a condition of pollution or nuisance. The trial court correctly denied SDG&E's petition for writ of mandate.

DISPOSITION

The judgment is affirmed.

---

" 'Pollution' means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: [¶] (A) The waters for beneficial uses. [¶] (B) Facilities which serve these beneficial uses." (§ 13050, subd. (*l*)(1)(A-B).)

" 'Nuisance' means anything which meets all of the following requirements: [¶] (1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment or life or property. [¶] (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. [¶] (3) Occurs during, or as a result of, the treatment or disposal of wastes." (§ 13050, subd. (m)(1-3).)

" 'Threaten' . . . means a condition creating a substantial probability of harm, when the probability and potential extent of harm make it reasonably necessary to take immediate action to prevent, reduce, or mitigate damages to persons, property, or natural resources." (§ 13304, subd. (e).)

HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.